Samuel H. Hofstadteb, J.
In this proceeding under article 78 of the Civil Practice Act, the petitioner, on behalf of himself and other controlled tenants in the apartment house, 929 Park Avenue, City of New York, seeks to annul a determination of the State Rent Administrator increasing the maximum rent of their apartments. The sole ground on which the Administrator’s action is here challenged is that the rent increases are based on the sale price of the property rather than on its current assessed valuation. Analysis of the terms and circumstances of the sale satisfies me that the position of the tenants is well taken—for such sale price was a contrived one which did violence to the spirit and intendment of emergency rent controls.
The Emergency Housing Rent Control Law (L. 1946, ch. 274, as amd.) assures an owner of property a net annual return of 6% of its valuation and permits him to apply for an adjustment of the maximum rent when the net return is less than 6%. The Rent Commission has adopted regulations implementing the foregoing statutory provisions. The law declares that the valuation on which the 6% net return is to be computed shall be the current assessed valuation as therein defined, “ except where there has been a bona fide sale of the property within the period between March fifteenth, nineteen hundred fifty-three, and the time of filing of the application, as the result of a transaction at arms’ length, on normal financing terms at a readily ascertainable price and unaffected by special circumstances such as a forced sale, exchange of property, package deal, wash sale or sale to cooperative ” (§ 4, subd. 4, par. [a], cl. [1], as amd. by L. 1957, ch. 755). In the case of such sale, the sale price is to be taken as the valuation.
The assessed valuation of the property at the time the landlord filed his application for increase was $380,000; the sale price on which the increase is predicated is $830,000. The former *1075 owner, Borehard Affiliates, Inc., on October 3,1957, entered into a contract to sell the property to Abraham Hirschfeld for $800,000. When this contract was made, 14 of the 37 apartments in the building were vacant pursuant to the seller’s policy adopted in 1954 of refusing to rent apartments as they became vacant. The contract of sale obligated the seller not to rent any of these vacant apartments or any others which might become vacant between the contract date and the date of closing title. Even before the closing date, the buyer prepared and submitted to the tenants a printed co-operative plan dated November 15, 1957, under which he would have obtained from the tenants in occupancy and purchasers of the vacant apartments $1,000,000 for his property. The tenants in occupancy promptly and unanimously rejected this co-operative plan.
Thus rebuffed by the tenants in his effort to turn the building into a co-operative, the buyer rejected title for an asserted defect and sued the seller for the return of his $25,000 downpayment made on the contract. The seller countered with a demand for specific performance. After trial, this court determined the issues in favor of the seller, granted specific performance against the buyer, and in addition assessed damages of $29,593.44 against him. In effectuation of the judgment embodying this determination, the parties on June 16, 1959 executed a second contract, pursuant to which the property was conveyed to Hirschfeld on June 26, 1959. The purchase price was now $830,000 — the original $800,000 plus $30,000, the round-sum equivalent of the damages which the court had awarded the seller. When Hirschfeld thus finally took title, the vacancies had increased from 14 to 16 apartments.
On August 13, 1959 the new owner filed the application for rent increase which resulted in the determination now under review. The Local Rent Administrator on May 17, 1960 issued orders increasing the respective maximum rents of the petitioner and the 15 tenants whom he represents, by 15%, retroactive to November 17,1959, and by a further 3% effective November 17, 1960. The State Rent Administrator on September 27, 1960, denied the protest of the tenants and affirmed the Local Rent Administrator’s orders.
Meanwhile the buyer had not abandoned his purpose to convert the property into a co-operative. On September 30, 1959, he conveyed the premises of record to 929 Park Avenue Apartments Corporation, and on October 1, 1959, submitted to the tenants in occupancy a second printed co-operative plan which raised by $220,000 the price under the 1957 rejected plan. Most of the vacant apartments have been sold on a co-operative basis *1076 under the second plan to new tenants, and the petition alleges that others have been rented without regard to the established maximum rent.
Apparently the Local Bent Administrator initially held the view that the sale of this property was attended by special circumstances, requiring the adoption of the assessed valuation rather than the sale price as its proper valuation. The Bent Commission’s valuation committee, however, thought otherwise, and eventually the Local Bent Administrator deferred to the opinion of the valuation committee. There is no substance to the petitioner’s complaint that the Local Bent Administrator was by this procedure “ deprived of the exercise of his own judgment and decision ”, for it does not appear that his orders as finally issued did not express his own considered judgment. The contrary is, of course, to be assumed. Moreover, since his orders have been affirmed by the State Bent Administrator, the method by which he reached his conclusion is now academic.
Nor may the sale to Herschfeld be held a forced sale as that term is used in the statute and the regulations. The petitioner urges that because Hirschfeld ultimately took title under compulsion of the judgment decreeing specific performance, the transaction was a forced sale. A forced sale, however, refers to one in which an owner, through economic pressure or stress of other circumstances, has little, if any, real voice in the transaction. The most common illustration of such a sale is a foreclosure sale. Self-evidently, the transaction under scrutiny here had no element or characteristic of a forced sale.
Nevertheless, the sale was such that the price paid cannot fairly be said to represent the true value of the property or be accepted as the basis of a rent increase, for, as we shall see, the price was clearly affected by special circumstances. Although Matter of Payson v. Caputa (9 A D 2d 226), mainly relied on by the respondent for the result reached by him in this case, intimated that the sale there considered, made to a purchaser who contemplated the organization of a co-operative, was not a sale to a co-operative, the court expressly refrained from directly so holding. It left it to the Bent Administrator to say whether the phrase “ sale to cooperative ” was to be broadly construed so as to include a sale in which the buyer was a conduit for a co-operative (pp. 233-235).
The court decided that whether the sale was one to a co-operative or not was not the applicable test; the focal question was whether the price was affected by special cireumstaces and, despite what was said about a sale to a co-operative, the court remanded the proceeding to the Bent Administrator for explora *1077 tian and resolution of that critical question. So here we may assume that the sale to Hirschfeld was not one to a co-operative. This assumption, however, by no means excludes a finding that the sale was attended by special circumstances which affected the price. If it was, then, under the law, the assessed valuation, not the sale price, must he used as the basis on which the 6% net return is to be computed. The instances given in the statute, in which special circumstances may affect the price, are obviously illustrative only; they are not all-inclusive. It is nevertheless significant that the Legislature manifested its awareness of the likelihood of an inflated price in a sale to a co-operative by using such sale as one of its illustrations. The court, in Payson (9 A D 2d 226, supra), also commented on the inflated prices paid on sales to co-operatives and the reasons which bring this about (p. 232).
"Whether the sale to Hirschfeld was or was not one to a co-operative, it bore many of the earmarks of such a sale. First and foremost were the 14 vacant apartments, later increased to 16. The seller had since 1954 deliberately withheld these apartments from the rental market, even though, as a result, the property was operated at a loss. It is almost superfluous to note that this course was adopted to make the property a desirable acquisition to one intending to form a co-operative. Thus the seller had already set the scene for a co-operative. That the seller correctly sensed the situation is fully borne out by its contract with Hirschfeld, to whom the vacancies were so valuable that he hound the seller to continue them until title passed. But for the prospect of a sale to one intent on conversion into a co-operative, the former owner would not have committed the economic folly of purposely keeping these apartments vacant and thereby running the property at a loss. Of course, withholding these apartments from the rental market during the continuing housing shortage was contrary to the spirit and purpose of the Emergency Housing Bent Control Law. The valuation committee itself in its memorandum attributed the high price paid by the buyer to the vacancies. The steps taken by the buyer to turn the building into a co-operative, both in 1957, before he had become the owner, and in 1959, after title had been taken, have already been recited. To say that the sale of this apartment house, currently assessed for $380,000, for $830,000, or even $800,000, was not affected by special circumstances, is to blind oneself to reality. We note in passing that the contract of sale mentions a pending certiorari proceeding brought by the seller to obtain a reduction in the assessed valuation.
*1078 The Payson sale differed markedly from the sale with which we are dealing here. The property there was offered publicly, in an open market, and the price paid by Payson was the highest bid among those made by several prospective purchasers, all the bids being within a reasonable range of one another. The mere statement of the circumstances in Payson shows how little it has in common with this case.
In no event was there warrant to include the $30,000 damages added to the original $800,000 sale price, as part of the price of the property.
The sale price was the product of an artificial situation — the disproportionate number of vacant apartments carried, in defiance of the policy of the emergency rent legislation, to promote a sale at an inflated price. To adopt a price so conceived as the value on which to compute the net return, would encourage like manipulation and make a mockery of rent control.
The determination of the respondent is annulled and the proceeding remitted to him with directions to use the current assessed valuation in processing the application for increase of the maximum rents.